**Bernard J. RUDDY, Claimant Below,
Appellant,**

**v.**

**I. D. GRIFFITH & CO., Employer Below,
Appellee.**

Supreme Court of Delaware.

Jan. 8, 1968.

Roy S. Shiels of Brown & Brown, Dover, for claimant below, appellant.

Jackson W. Raysor, of Tunnell & Raysor, Georgetown, for employer below, appellee.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

HERRMANN, Justice:

In this workmen's compensation case, we are required to determine the meaning of "earning power", as that term is used in 19 Del.C. § 2325,[1] and, in the ascertainment thereof, the consequence of an employee's post-injury return to the same employment for the same compensation.

I.

These pertinent facts are uncontroverted: The employee, Bernard J. Ruddy, was a welder in sheet metal work in the employ of I. D. Griffith & Co. (hereinafter "Griffith"). On June 11, 1965, Ruddy fainted while at work at the plant. The attack came upon him as he worked from a ladder, in extraordinary heat, on the sixth floor of the building, while leaning through a window. He had carried his tools and some sheet metal up the ladder.

After a first-aid electrocardiogram by the plant physician, Dr. George Henning, it was discovered that Ruddy had suffered a heart attack, a myocardial infarction. Following a period of hospitalization and home recuperation, Ruddy returned to work

---

1. 19 Del.C. § 2325 provides:

"§ 2325. Compensation during partial disability

"For injuries resulting in partial disability for work, except the particular cases mentioned in subsections (a)–(g) of section 2326 of this title [i. e., scheduled injuries], the compensation to be paid shall be 66⅔ percent of the difference between the wages received by the injured employee before the injury and the earning power of the employee thereafter, but such compensation shall not be more than $50 per week. This compensation shall be paid during the period of such partial disability for work, not, however, beyond 300 weeks. In construing the words 'earning power of the employee thereafter' as those words appear in this section, the Board shall take into consideration the value of gratuities, board, lodging and similar advantages received by the employee in a subsequent employment."

for Griffith on September 13, 1965, with the doctor's permission. He was assigned to "light work" on the first day, but on the second day, again with the doctor's permission, he resumed his regular and ordinary duties as a welder, without restriction or limitation, at the same compensation he was earning at the time of the heart attack. On October 6, 1965, Ruddy filed a claim for compensation and a hearing thereon was held before the Industrial Accident Board on January 21, 1966, which produced the following:

"BY THE CHAIRMAN:

"Q Are you presently working?

"A Yes, sir.

"Q Doing anything?

"A Doing anything.

\* \* \* \* \* \*

"Q So that after your second day back to work on the job then, you say, you have been doing whatever the job required?

"A Whatever it requires.

"Q Are you compensated at the same rate of pay as prior to June 11? Are you receiving the same pay?

"A The same pay, yes, sir.

"Q So the same pay the same duties?

"A Yes, sir.

\* \* \* \* \* \*

"Q And I think you said earlier that the way you feel now you can do whatever you have to do in connection with your work, and have worked constantly since September?

"A In fact, I feel better now than I felt in the past 10 years, I would say."

Ruddy had been seen by Dr. Charles Allen once, on August 4, 1965. Upon the basis thereof, Dr. Allen testified:

"Q Have you examined the patient in respect to determining what amount of residual effect might have occurred because of the heart attack?

"A Again I think examining him in the light of his usual occupation he certainly has to be limited in the amount of physical work he can do in the future. The time I saw him he was well convalesced from his heart attack. He was under very good close medical supervision and had just really started an increase in his activity. As a matter of fact, the week I saw him he was due back to work on a limited basis. I think again from a standpoint of his usual occupation no one is going to allow him to carry heavy tools up a ladder; no one is going to allow him to do quite the work he did prior to his heart attack. So I think in light of that, and digging into all the references I could find medically for medical cardiology, which is now getting to be a specialty of its own, I felt that he was certainly disabled to a point of earning his living as far as his present occupation was concerned. To judge again for sake of inability to get another job if he ever loses this one, I don't believe many companies are hiring laborers who have had previous heart attacks. We came up with a 20 to 30 per cent disability. As I say, as a number it is not quite as easy as surgery where you lose a finger and you have a set fee schedule or set percentage.

\* \* \* \* \* \*

"Q Now, could you tell me once again the basis for the number which you described it as in assessing the disability that you find he now has between 20 and 30 per cent? What factors go into reaching that determination?

"A The medical authority on compensation cardiology or heart attacks related to the industrial field is a Dr. Segal in New York. And on some of his articles, although he never gave a definite formula, based his percentages on the type of work they must go back to and how much limitation they have. An office

worker, an executive may be zero percent due to the fact that he could fully return to work. The heavy truck loader or ditch digger may be 90 per cent because he'll never return to work. And we gradually try to give a formula for somewhere in between partially disabled from his heart.

"Q So that the 20 to 30 per cent that you refer to relates to the nature of the activities he might subsequently perform?

"A Or his limitation thereof, yes, sir.

"Q Yes. And, as you say, suppose Mr. Ruddy instead of being a sheetmetal worker or welder was, in fact, an office worker, would your percentage vary then?

"A Yes, indeed."

The Industrial Accident Board found that as a result of the heart attack, Ruddy was unable to be gainfully employed for the period June 12 to September 16, 1965; that he was entitled to compensation therefor, together with reasonable medical and hospital expenses. The Board further found, however, that Ruddy had failed to establish by a preponderance of the evidence that he had suffered either a loss of "earning capacity" or a permanent disability attributable to the June 11 occurrence.

Upon appeal to the Superior Court, the action of the Board was affirmed. Ruddy appeals.

## II.

■ The Superior Court held that, by reason of his return to the same employment with the same wages, Ruddy was confronted with a rebuttable presumption that no loss of earning capacity had occurred; and that he had failed to adduce evi-

dence sufficient to overcome that presumption. We agree.

■ The term "earning capacity", as used by the Board and the Superior Court, and the term "earning power", as used in 19 Del.C. § 2325, are synonymous; they both mean earning ability. It is important to note that the term "earning power", as used in the Act, does not mean actual earnings or "wages received", the term used in § 2325 for the pre-injury factor of the computation of disability. This is apparent from the fact that, in § 2325, the General Assembly chose a different phrase, i. e., "earning power", for the post-injury factor. Thus, it is clear that actual earnings and "earning power" are not synonymous under the Delaware Statute.[2]

■ It is generally held that the fact that the employee receives post-injury compensation equal to that earned by him before the injury, will not, *per se*, defeat his claim for compensation. But it is also generally held that where the injured employee returns to his former work for the same employer at the same or higher wages, this is evidence that his earning capacity has not been impaired; and unless there is some affirmative evidence of such impairment, compensation will be denied. Otherwise stated, in such situation there is a well-recognized presumption of non-impairment of earning capacity. See Annotation, 149 A.L.R. 413, 419, et seq.; 2 Larson, Workmen's Compensation, § 57.22. This presumption may be rebutted and overcome, however, in a variety of ways, the more usual involving a showing that the post-injury compensation, *per se*, is an unfair criterion of earning power. The approaches usually adopted for this purpose have been summarized at 149 A.L.R. 413, 438, as follows:

"There are a number of possible explanations of the fact that an employee

2. Compare the New York Statute governing partial disability, which expressly provides that post-injury wage-earning capacity is to be determined by actual

post-injury earnings. See Croce v. Ford Motor Co., 307 N.Y. 125, 120 N.E.2d 527 (1954).

who receives higher wages after an injury than he earned before may still have suffered an impairment of earning capacity. Thus, it may indicate: (1) that the employee is the beneficiary of a mere gratuity and does not actually 'earn' his wages; (2) that the employee, by education and training, has fitted himself for more remunerative employment; (3) that the employee works longer hours than he did before his injury, his hourly remuneration having decreased; (4) that a general change in wage scales has taken place for the type of work or in the industry; (5) that the new wages are intended as an inducement to him to refrain from pursuing a claim; (6) that the employee, before his injury, was younger or a minor; or (7) that the employment in which the employee was employed after his injury was of uncertain duration. * * *."

See also 2 Larson, Workmen's Compensation, §§ 57.22, 57.32–57.35.

In the instant case, no such explanation of the continuation of equal post-injury compensation was offered by the claimant. Indeed, his own testimony refutes many of the grounds upon which equal post-injury compensation is ordinarily discounted as a criterion of earning power.

The claimant places sole reliance upon the above testimony of Dr. Allen, as the ground upon which he would have us hold that the presumption of no impairment of earning power has been successfully rebutted. We have reviewed Dr. Allen's testimony carefully; we find it insufficient to overcome the strong presumption of no impairment of earning power, arising from Ruddy's return to the performance of the same duties for the same compensation. Dr. Allen's testimony appears to be based solely upon physical and functional considerations, and amounts to little more than a professional opinion as to the percentage of physical and functional disability suffered by Ruddy. Dr. Allen saw Ruddy only once—approximately five weeks before his return to work—and there is no indication that Dr. Allen was exercising any more than a physician's professional judgment, without any special knowledge of the requirements of Ruddy's work, or the labor market, or the competitive employment conditions within the industry in which Ruddy was engaged. There is no indication that Dr. Allen considered such factors as claimant's age, education, general background, occupational and general experience, the nature of work performable under the physical impairment, the availability of such work, or any other of the many factors that may go into the determination of impairment of earning power. Compare Ham v. Chrysler Corporation, Del., 231 A.2d 258, 261 (1967). Dr. Allen's testimony appears to be based upon the assumption that functional disability, related to usual or present occupation, equates loss of earning capacity. This is not necessarily so; physical or functional disability is but one of the factors to be considered in determining loss of earning power; and earning ability is not necessarily wedded to usual or present occupation. In short, more than the speculation indulged in by Dr. Allen is required to overcome the strong presumption here involved. Compare Shaffer v. Midland Empire Packing Co., 127 Mont. 211, 259 P.2d 340 (1953); Henderson v. Iles, 250 Iowa 787, 96 N.W.2d 321 (1959); Garris v. Weller Construction Co., Fla., 132 So.2d 553 (1961); Glass v. Edens, 233 Ark. 786, 346 S.W.2d 685 (1961); Bowen v. Chiquola Manufacturing Co., 238 S.C. 322, 120 S.E. 2d 99 (1961); Elliott v. Ross Carrier Co., Inc., 220 Miss. 86, 70 So.2d 75 (1954).

■ The claimant calls our attention to, and invites us to join in, the advocacy of the author at 2 Larson, Workmen's Compensation, § 57.31, regarding obviously permanent physical impairments that do not qualify, however, as scheduled injuries un-

der the pertinent Statute.[3] We all know, of course, the debilitating effect of a heart condition upon a workman engaged in heavy physical exertion, and the effect thereof, as time goes by, upon his relative position in the competitive labor market. The General Assembly has carefully delineated in our Act, however, between scheduled injuries, as to which actual wage loss is immaterial, and unscheduled injuries, as to which loss of earning power is expressly required by the Statute in order to justify compensation. As we have often stated, there are no rights to workmen's compensation except those granted by the Act, and those to which the claimant can prove himself entitled thereunder by a preponderance of the evidence. If certain non-scheduled injuries, such as heart injury, are to be merged with scheduled injuries, so that actual wage loss becomes immaterial to proof of disability, the General Assembly must make the change.[4]

 Finally, we comment upon the point made by the claimant that employers must not be permitted, by temporary reemployment, to lull an employee into inaction and loss of standing to make a claim until the period of limitations has run. Compare Luckenbach S.S. Co. v. Norton (3d Cir., 1938) 96 F.2d 764; Gailey v. Peet Bros. Manufacturing Co., 98 Kan. 53, 157 P. 431 (1916). And we note, too, Ruddy's point that we should not reach a result in this case which would require a claimant to reject an offer of reemployment at the same salary as the price of being able to prove a disability. Both points, we think, are well taken; but neither is apposite in this case. Ruddy was not lulled into inaction by his reemployment; on the contrary, his claim for compensation was filed within a few days after he returned to work. And we have not held herein that Ruddy is barred from compensation by reason of his reemployment; we hold only that he has the additional burden of adducing affirmative evidence of loss of earning power sufficient to counteract the presumption that there was no such loss. If Ruddy shall be dismissed from his present employment by reason of inability to perform the work because of the heart attack, or shall be otherwise able in the future to show a loss of earning power by reason thereof, he is protected by his right to seek a review by the Board. 19 Del.C. §§ 2347, 2361(b).

Other grounds asserted on this appeal are rendered academic by the foregoing conclusions.

For the reasons stated, the judgment below is affirmed.

3. At 2 Larson, Workmen's Compensation, p. 12, the author states:
"* * * When a man stands before the Commission with proved permanent physical injuries, for which the exclusive-remedy clause has abolished all possibility of common-law damages, it is not easy to tell him that he has undergone no impairment of earning capacity, solely on the strength of current pay checks. This is especially true when many injuries of even less severity would be compensable in the same circumstances solely because they happened to be of the kind listed in the schedule. Dissatisfaction with this discrimination between schedule and non-schedule permanent partial disability is leading to various other kinds of remedial action. Wisconsin, for example, has lumped schedule and non-schedule injuries together under a common principle that actual wage loss is immaterial in proving disability. * * *."

4. Compare such legislative action taken in the State of Wisconsin, 2 Larson, Workmen's Compensation, § 57.31, p. 12.